## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| EDWARD J. ROMERO, | Bankruptcy Case No. 15-11254 TBM |
| Debtor. | Chapter 7 |

---

### MEMORANDUM OPINION AND ORDER ON HOMESTEAD EXEMPTION

---

Driven by the concept of Manifest Destiny, slogans like "Go West, Young Man," and the promise of opportunity, pioneers pushed westward even before Colorado became a State. Settlement by homesteading was a central feature of the expansion. Federal and state law encouraged the migration West by offering homesteads — and protecting them. Colorado exempted homesteads from execution in its Constitution and early statutes.

This case presents a modern twist on homesteading. On his bankruptcy Schedule C, the Debtor, Edward J. Romero (the "Debtor"), listed a "1997 Peterbilt truck" as exempt under the Colorado homestead statute. A long-haul truck driver, the Debtor claimed that his semi-truck and its cab (including living quarters) are protected by the homestead exemption. The Chapter 7 Trustee, Kimberley H. Tyson (the "Trustee") filed an Objection to Claimed Exemption. (Docket No. 15.) The Debtor submitted a Response in opposition. (Docket No. 19.) Now, the Court decides whether the Debtor's truck is a homestead within the meaning of C.R.S. § 38-41-201(a).

### I.    Jurisdiction.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a), (b), and (e). This dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O) since it involves an objection to the Debtor's claimed exemption from property of the estate and the administration of his estate.

### II.    Procedural Background.

The Debtor filed for protection under Chapter 7 of the Bankruptcy Code, on February 12, 2015. He owns no real property. On his Schedule B (Personal Property),[1] the Debtor listed a 1997 Peterbilt truck (the "Peterbilt Truck"),[2] which he values at $45,000. On Schedule C, the

---

[1]    Schedule B requires debtors to list all of their personal property, including motor vehicles.

[2]    The Debtor referred to the Peterbilt Truck as a "truck" on his Schedules B and C. However, during his testimony, the Debtor also described the vehicle as a "tractor." The term "tractor" refers to part of the "tractor-trailer" combination commonly used in the long-haul trucking industry. For purposes of consistency and simplicity, the Court refers to the vehicle as the "Peterbilt Truck."

Debtor claims an exemption in the Peterbilt Truck in the amount of $45,000 pursuant to the Colorado homestead statute, C.R.S. § 38-41-201(a).  The Trustee objected to the Debtor's claim of exemption.  She argues that the Peterbilt Truck is not a homestead under C.R.S. § 38-41-201(a).  The Debtor filed his Response and alleges that the Peterbilt Truck is his home and properly subject of exemption.   The Court held a non-evidentiary hearing and an evidentiary hearing on the dispute on May 26, 2015 and June 10, 2015, respectively.  The Debtor testified at the evidentiary hearing.

III.   <u>Findings of Fact</u>.

On the basis of the evidence presented at the June 10, 2015 hearing, the Court makes the following findings of fact:

The Debtor owns the Peterbilt Truck.  It is worth $45,000.  The Peterbilt Truck has a Caterpillar-brand engine, a steering axle, and two drive axles.  It is almost 14 feet long.  The Peterbilt Truck is a commercial vehicle designed to be driven on the road and to tow a trailer to haul goods.  It is not designed to be installed in a permanent or semipermanent location and is not affixed to any real property.

The Debtor is an independent, long-haul, truck driver who works for himself under the business name Romero Transportation, Inc.  The Peterbilt Truck is critical to the Debtor's trucking business and is driven on the road regularly.  The Debtor drives the Peterbilt Truck approximately 20 to 25 days per month throughout the country.  Since most of the Debtor's business is outside of Colorado, the Debtor and the Peterbilt Truck typically are in Colorado only four or five days each month.

The Debtor lives in the Peterbilt Truck.  Behind the driving compartment of the Peterbilt Truck is a fairly large cab which serves as the Debtor's principal living and sleeping quarters.  The cab has a bed, microwave oven, toaster, coffee pot, refrigerator, laser printer, television, light, and vacuum.  In addition to food and water, the Debtor also neatly stores his clothes, laundry, and sundry items in a dozen plastic boxes mainly located in a small loft above the bed.  A self-contained portable toilet rounds out the cab's equipment.  The Debtor's dog lives with him in a small kennel near the bed.  The Peterbilt Truck has a 12-volt generator to provide electricity, heat, and air-conditioning when the vehicle is parked.

The Debtor spends almost all of his evenings living in the Peterbilt Truck when on the road.  Often, he parks at truck stops overnight.  When he is not on the road, the Debtor usually stays in the Peterbilt Truck while it is parked in a commercial area near Windsor, Colorado.  Sometimes, he spends nights with friends or family in their homes.  The Debtor did own a house which was sold sometime before the bankruptcy case was filed.  However, he did not live there; he rented it to a friend.  When the house was sold, the proceeds were used to rebuild the engine of the Peterbilt Truck.  The Debtor does rent a small room, approximately 6 feet by 8 feet, from his son.  The room is used as an office for the Debtor's trucking business.  It does not have a bed.  The Debtor does not sleep in the office.

2

The Court finds that the Debtor has been living on the Peterbilt Truck since approximately 1998. The Debtor considers the Peterbilt Truck to be his home.

IV.    <u>Legal Discussion</u>.

The issue presented in this dispute is important for the Debtor. There is no doubt that the Debtor primarily lives in the Peterbilt Truck and considers it his home. The Peterbilt Truck also is integral to the Debtor's future plans. Without the Peterbilt Truck, the Debtor will have no way of continuing as an independent, long-haul trucker: he will be a trucker without a truck. Equity suggests that the Debtor be allowed to keep his source of shelter and income. However, under the Bankruptcy Code, the Trustee is obligated to "collect and reduce to money property of the estate…" for the benefit of creditors. 11 U.S.C. § 704. The Peterbilt Truck is "property of the estate" under 11 U.S.C. § 541(a), subject to a possible exemption. As this issue has been presented to the Court, the only real question is whether the Peterbilt Truck qualifies as a homestead under Colorado law so that it is exempt from turnover to the Trustee. The Court has come to the conclusion that the Peterbilt Truck is not an exempt Colorado homestead.[3]

A.    <u>Choice of Law and Burden of Proof</u>.

The commencement of a bankruptcy case creates an estate that includes "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a). However, a debtor may exempt certain property from the bankruptcy estate. 11 U.S.C. 522(b); *see also Kulp v. Zeman (In re Kulp)*, 949 F.2d 1106, 1107 (10th Cir. 1991). Section 522 contains a list of approved federal exemptions but also permits States the authority to "opt-out" from federal exemptions and substitute State exemptions instead. Colorado elected to "opt-out" from the federal exemption scheme. C.R.S. § 13-54-107 (federal exemptions are "denied to residents of this state"; Colorado residents may only claim exemptions under Colorado statutes). As a result, Colorado law governs exemptions claimed by Colorado residents such as the Debtor. 11 U.S.C. § 522; *Law v. Siegel*, ___ U.S. ___, 134 S. Ct. 1188, 1196-97 (2014)("when a debtor claims a *state-created* exemption, the exemption's scope is determined by state law"); *Kulp*, 949 F.2d at 1107 (interpreting Colorado exemption statutes).

Once an exemption is asserted, the party objecting to the exemption has the burden of proving that the exemption is not properly claimed. Fed. R. Bankr. P. 4003(c); *In re Larson*, 260 B.R. 174, 186 (Bankr. D. Colo. 2001). If, however, the objecting party can produce evidence to rebut the exemption, then the burden shifts to the debtor to produce evidence

---

[3]    The Court's ruling on the homestead exemption is driven by the statutory text, but may appear a harsh result. The Court encourages the Debtor and the Trustee to consider other avenues in this bankruptcy case. For example, the Peterbilt Truck might qualify for different exemptions. *See* C.R.S. § 13-54-102(1)(i)(stock in trade, machines, tools, equipment, and business materials used for purposes of carrying on gainful occupation); and C.R.S. § 13-54-102(1)(j)(I)(motor vehicles). Colorado exemptions also are set to change in the future. *See* An Act Concerning Debt Collection Proceedings, Colo. Senate Bill 15-283 (effective July 1, 2015). Moreover, the Debtor might consider alternatives under Chapter 13 of the Bankruptcy Code or possible dismissal. The Court appreciates that the Trustee herself has noted the equitable issues that this case raises.

demonstrating that the exemption is proper. *Id.* The burden of persuasion remains with the objecting party.

Notwithstanding, the Colorado Constitution and an unbroken line of Colorado cases instructs that Colorado exemptions are to be construed liberally in favor of Colorado residents claiming such exemptions. *See* Colo. Const., Art. XVIII § 1 ("The general assembly shall pass liberal homestead and exemption laws.");[4] *Kulp*, 949 F.2d at 1108 (interpreting Colorado exemption liberally based on Colorado Constitution); *In re Case*, 66 B.R. 44, 45 (Bankr. D. Colo. 1986).

B.   The Plain Meaning of the Colorado Homestead Statute Dictates that the Peterbilt Truck is not a Homestead.

The Debtor argues that the Peterbilt Truck is exempt under C.R.S. § 38-41-201(a).[5] The current version of the Colorado homestead statute (the "Homestead Statute") simply states:

> Every *homestead in the state of Colorado* shall be exempt from execution and attachment arising from any debt, contract, or civil obligation not exceeding in actual cash value in excess of any liens or encumbrances on the homesteaded property in existence at the time of any levy of execution thereon: (a) The sum of sixty thousand dollars if the homestead is occupied as a home by an owner thereof or an owner's family. (emphasis added)[6]

Thus the pivotal issue in this case is whether or not the Peterbilt Truck is a homestead within the meaning of C.R.S. § 38-41-201(a).[7]

Since the Colorado Homestead Statute does not define the term "homestead," the Court starts with the plain or ordinary meaning of the word "homestead." *Clark v. Rameker*, ___ U.S. ___, 134 S. Ct. 2242, 2246 (2014); *Hamilton v. Lanning*, 560 U.S. 505, 512 (2010); *Asgrow Seed*

---

[4]   Colo. Const., Art. XVIII § 1 was an original part of the Colorado Constitution effective as of August 1, 1876.

[5]   The Debtor's Schedule C also references C.R.S. § 38-21-201.5, which extends the homestead exemption to mobile homes. However, during the hearing on May 26, 2015, the Debtor's counsel acknowledged that C.R.S. § 38-21-201.5 is inapplicable and confirmed that the Debtor no longer asserts entitlement to an exemption under that provision. Given the Debtor's concession, this decision does not focus on C.R.S. § 38-21-201.5. However, the Court notes that the Peterbilt Truck is not a "mobile home" within the meaning of C.R.S. § 38-21-201.5.

[6]   C.R.S. § 38-41-205 also states: "The homestead mentioned in this part 2 may consist of a house and lot or lots or of a farm consisting of any number of acres." There is, of course, no mention of a truck in the Homestead Statute. In turn, C.R.S. § 38-41-202 refers to C.R.S. § 38-41-205 as "relating to the type of property which may be homesteaded."

[7]   Put another way, could the Debtor have "homesteaded" the Peterbilt Truck? Rephrasing the question in this way (based on the "homesteaded property" phrase in the Homestead Statute) suggests the answer. Applying ordinary English, a person may not "homestead" a truck.

4

*Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a stature are undefined, we give them their ordinary meaning."); *Granite State Ins. Co. v. Ken Caryl Master Ass'n*, 183 P.3d 563, 567 (Colo. 2008) (applying plain language approach). The inquiry must begin with the "language of the statute itself." *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 68 (2011) (quoting *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). And the exercise should focus on the meaning of the statute text at the time of enactment. *Baker Botts LLP v. Asarco LLC*, ___ U.S. ___, 2015 WL 2473336 at * 5 fn. 2 (2015) (interpreting the word "services" as of 1934 when the term was first used in the statute).

Colorado's homestead exemption predates statehood. On January 10, 1868, the Council and House of Representatives of Colorado Territory approved an "Act to Provide for Homesteads in Colorado Territory." C.R.S. Chap. XLVIII, § 57 *et seq*. (1868) (the "1868 Homestead Statute"). The 1868 Homestead Statute provided:

> Every householder in Colorado territory, being the head of the family, shall be entitled to a *homestead* not exceeding in value the sum of two thousand dollars, exempt from execution and attachment, arising from any debt, contracts, or civil obligation . . .

Two other provisions from the 1868 Homestead Statute are notable. Section 58 stated: "To entitle any person to the benefits of this act, he shall cause the word "Homestead" to be entered of record in the margin or his recorded title to the same." Thus, the 1868 Homestead Act was directed to recorded rights in real property. Section 61 clarified that "[t]he homestead mentioned in this act may consist of a house and lot or lots, in any town or city, or of a farm consisting of any number of acres." Again, the original statutory text focused on real property.[8]

Aside from the statute itself, to ascertain the ordinary meaning of the word "homestead" as used in the 1868 Homestead Statute, the Court looks at the context and meaning during that time period. The 1868 Homestead Statute followed closely on the heels of one of the most significant pieces of federal legislation impacting the development of Colorado and the entire American West: the Homestead Act of 1862, Act of May 20, 1862, Ch. 75, 12 Stat. 392 (codified at 43 U.S.C. §§ 161-284, repealed 1976) (the "Federal Homestead Act").

The Federal Homestead Act encouraged settlement of federal lands (and displacement of native peoples) by entitling United States citizens: (1) to enter on a "one quarter section or less quantity of unappropriated public lands"; (2) to submit an application to the register "of the land office" noting the entry and confirming the intention of "actual settlement and cultivation"; and (3) to obtain a federal patent to the lands provided that the applicant had "resided upon or cultivated" the land for at least five years. Federal Homestead Act §§ 1 and 2; *see also Amoco Prod. Co. v. S. Ute Indian Tribe,* 526 U.S. 865, 868 (1999) (Federal Homestead Act encouraged settlement of the West); *Shiver v. U.S.*, 159 U.S. 491, 497 (1895) (describing the Federal Homestead Act). The Federal Homestead Act also had a partial exemption feature: "[N]o lands

---

[8]      There is no indication in the 1868 Homestead Statute that one could have homesteaded personal property, such as a wagon. In 1868, wagons were the preferred means of hauling goods long distances, much like semi-trucks today.

acquired . . . shall in any event become liable to the satisfaction of any debt" prior to the issuance of the land patent. *Id*. § 4. Thus, under the Federal Homestead Act, the term "homestead" was used entirely in relation to real property.

Although this Court is interpreting the ordinary meaning of the word "homestead" under Colorado law, not under Federal law, the Federal Homestead Act nevertheless does provide important context to use of the word "homestead" in the West. *See Aulston v. United States*, 915 F.2d 584, 585 (10th Cir. 1990) ("To gain a proper understanding of the statute at issue, we must put in into its historical context."). Plain meaning also may be ascertained by examining typical usage of words. At the time that the 1868 Homestead Statute was enacted by the territorial legislature, the commonly-accepted meaning of the term "homestead" required a connection to land. For example, N. Webster, *A Dictionary of the English Language* 203 (Ivison, Blakeman, Taylor & Co. Pub., 1867), defined the word "homestead" as: "A person's dwelling place, with that part of his landed property which is about and contiguous to it." Other period dictionaries were similar.[9] *See* J. Worcester, *Dictionary of the English Language* 691 (Hickling, Swan and, Brewer Pub., 1860) ("The place of the house; a mansion-house with adjoining land"); J. Stormonth, *A Dictionary of the English Language* 452 (Harper Bros. Pub., 1885) ("the ground on which a house stands, and the enclosed ground surrounding it"); R. Hunter and C. Morris, *Universal Dictionary of the English Language* 2532 (Collier Pub., 1897) ("A person's dwelling-house, with the ground and buildings immediately adjoining").

In the nineteenth century legal realm, the term "homestead" was used in accordance with its popular meaning. J. Smyth, *The Law of Homestead Exemptions* 89 (Sumner Whitney & Co. Pub. 1875) ("The word 'homestead' is used both in the constitutions and the statutes [of various states] in its ordinary and popular sense . . ."). And like popular usage, legal scholars used the word "homestead" in the context of land. *Id*. at 101; S. Rapalje and R. Lawrence, *A Dictionary of American and English Law* 614 (Frederick D. Linn & Co. Pub., 1888) ("The place where a home or house is situated; the permanent residence of a person who is the head of the family, with the land and outbuildings contiguous to the house."); W. Whitney, *The Century Dictionary: An Encyclopedic Lexicon of the English Language* 2865 (Century Co. Pub., 1889)("A family's dwelling-place, with the inclosure or ground immediately contiguous").[10]

In 1876, when Colorado became a State, the term "homestead" was incorporated into the Colorado Constitution and a new statute: General Laws, Chap. XLVI, § 1343 (1876). The new statute was identical to the 1868 Homestead Statute. Like its predecessor, the 1876 version of the homestead law also included the condition precedent that the word "Homestead" be entered of record in the margin or title to real property. *Id*. § 1344. By retaining the language of the 1868 Homestead Statute "without change upon attainment of statehood," the Colorado legislature reaffirmed the plain text and meaning of its original version. *See* S. Riesenfeld,

---

[9]       *See Baker Botts ___ U.S. ___*, 2015 WL 2473336 at * 5 (utilizing dictionaries from time period when statute was passed to confirm plain meaning).

[10]      The current meaning of "homestead" is the same as the past. *See* B. Garner, *Black's Law Dictionary* 850 (10th ed. Thomson Reuters 2014) (homestead means "the house, outbuildings, and adjoining land owned and occupied by a person or family as a residence").

"Homestead and Bankruptcy in Colorado and Elsewhere," 56 *U. Colo. L. Rev.* 175, 176 (Winter 1985) (noting the lack of change from 1868 to 1876).

The 1868 Homestead Statute survived almost verbatim for a century (except for minor changes to the amount of the exemption). *Id.* (only "relatively minor substantive and technical amendments" from 1876 to 1975). In 1975, the Colorado legislature revised the Colorado homestead exemption from a system of "declared" homesteads (i.e. mandatory recording in real property records) to a system of "automatic" homestead exemptions. *Id. See also Digest of Bills Enacted by the Fiftieth General Assembly* (Colo. Legislative Drafting Office, July 1975) ("the major change being the automatic creation of said exemption… and the revision of procedures for levying on real property."). But even with those changes, the Colorado legislature kept the word "homestead" and never purported to change the meaning of the term to eliminate an association with land.

Until present, the last significant changes to the Colorado homestead exemption were made in 1982 through the addition of C.R.S. §§ 38-41-201.5 and 38-41-201.6 concerning mobile homes. C.R.S. §§ 38-41-201.5 is a legislative declaration recognizing the increasing number of mobile homes in Colorado and stating that "mobile homes should be entitled to a homestead exemption."[11] C.R.S. § 38-41-201.6 provides the substantive addition and states:

> A manufactured home as defined in section 38-29-102(6), which includes a mobile home or manufactured home as defined in section 38-12-201.5(2), 5- 1-301(29), or 42-1-102(106)(b), C.R.S., that has been purchased by an initial user or subsequent user and for which a certificate of title or registration has been issued in accordance with section 38-29-110 or pursuant to section 38-29-108, is a homestead and is entitled to the same exemption as enumerated in section 38-41-201 . . .  For purposes of this homestead exemption, the term "house" as used in section 38-41-205 shall be deemed to include mobile homes or manufactured homes.

---

[11]     The full text of C.R.S. § 38-41-201.5 states: "The general assembly hereby finds and declares that, as the cost of conventional housing continues to escalate, mobile homes will become an ever larger percentage of the total housing supply, particularly for the elderly and the low-to-moderate income groups; that the purchase of a mobile home is a major investment; that most mobile homes are permanently or semipermanently located; that great improvements have been made in the quality and variety of such homes; and that mobile homes are dwellings which should be accorded a status equivalent to conventional homes. The general assembly recognizes, however, that mobile homes are more readily moved than conventional homes; that they are presently bought and sold as personal property and that there are advantages to both the industry and consumers to continue this practice; and that they presently have a dual nature in the area of taxation and tax collection; therefore mobile homes should be entitled to a homestead exemption."

C.R.S. § 38-41-201.6 presents a challenging myriad of eight cross-references.  However, for present purposes, only the definitions of "manufactured home" and "mobile home" are relevant.

C.R.S. § 38-29-102(6) defines a "manufactured home" as a "preconstructed building unit . . . that is constructed in compliance with the federal manufactured home construction safety standard."  42-1-102(106)(b) also defines "manufactured home" as:

> any preconstructed building unit . . ., without motive power, where such unit or units are manufactured in a factory or at a location other than the residential site of the completed home, which is designed and commonly used for occupancy by persons for residential purposes, in either temporary or permanent locations, and which unit or units are not licensed as a vehicle.

The Debtor does not argue that the Peter built Truck is a "manufactured home" under these statutes.  It is not since the Peterbilt Truck is not a "preconstructed building unit," and is not "designed and commonly used" for residential occupancy.  Also, the Peterbilt Truck has "motive power" and is licensed as a vehicle.

C.R.S. § 38-12-201.5(2) defines "mobile home" as:

> a single-family dwelling built on a permanent chassis designed for long-term residential occupancy and containing complete electrical, plumbing, and sanitary facilities and designed to be installed in a permanent or semipermanent manner with or without a permanent foundation, which is capable of being drawn over public highways as a unit, or in sections by special permit, or a manufactured home as defined in section 38-29-102 if the manufactured home is situated in a mobile home park.

The C.R.S. § 5-1-301(29) definition of "mobile home" is very similar.  The Debtor does not argue that the Peterbilt Truck is a "mobile home" under this statute.  It is not because it is not "designed for long-term residential occupancy," is not "designed to be installed in a permanent or semipermanent manner with or without a permanent foundation," and is not "capable of being drawn over public highways."[12]  Further, it is not a covered "manufactured home" because the Peterbilt Truck is not "situated in a mobile home park."

Although the "mobile home" and "manufactured home" changes to the Colorado homestead exemption do not apply to the Peterbilt Truck, the amendments do provide some important context concerning the word "homestead" in the Colorado Homestead Statute.  The two changes suggest that mobile homes and manufactured homes were not considered homesteads prior to 1982 because they had attributes of personal property.  But the Colorado

---

[12]     The Peterbilt Truck draws (or tows) a semi-trailer.  Since it is self-propelled, the Peterbilt Truck is not typically "drawn over public highways" (except if it breaks down).  Instead, it does the "drawing."

legislature determined that "mobile homes should be accorded a status equivalent to conventional homes and should be entitled to a homestead exemption . . . a mobile home shall be deemed sufficient to qualify as ownership of real property or land . . ." *Digest of the Bills of the Fifty-Third General Assembly* (Colo. Legislative Drafting Office, May 1982).

Thus, the Colorado legislature provided a special homestead status for mobile homes and manufactured homes — but not other types of personal property.[13] The statutory interpretation canon of *expressio unius est exclusio alterius* (inclusion of one thing implies the exclusion of the other) also suggests that by including the narrow definitions of "mobile home" and "manufactured home," the Colorado legislature did not extend the exemption to other things (such as the semi-truck) not within the ambit of the definition. *See Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168 (2003). This doctrine has been applied repeatedly in construing Colorado statutes. *Henisse v. First Transit, Inc.*, 247 P.3d 577, 580 (Colo. 2011). In *Henisse*, the Colorado Supreme Court held: "When the legislature specifically includes one thing in a statute, it implies the exclusion of another . . . Because the General Assembly explicitly included some groups that would not normally be considered 'public employee[s]' under the CGIA, it necessarily excluded all other groups not fitting the definition." *Id.*

In any event, consistent with the plain meaning of the word "homestead," when the Colorado legislature enacted the 1982 changes, it still tied the term to "real property." For example, a covered "manufactured home" must have a "site," be "designed and commonly used for occupancy by persons for residential purposes," and not be self-propelled. And a covered "mobile home" must be designed for "long-term residential occupancy and containing complete electrical, plumbing, and sanitary facilities" and be "designed to be installed in a permanent or semipermanent manner with or without a permanent foundation." Put another way, the manufactured home and mobile home still must be associated with real property.

The Court determines that a fair reading of the statutory text of the Colorado Homestead Statute (as originally enacted in 1868 and now) dictates that the Peterbilt Truck is not a "homestead" within the meaning of the law. This is so because the Peterbilt Truck is not associated with land.[14] It is not permanently or semipermanently installed on real property. It

---

[13]    The statutory interpretation canon of *expressio unius est exclusio alterius* (inclusion of one thing implies the exclusion of the other) also suggests that by including the narrow definitions of "mobile home" and "manufactured home," the Colorado legislature did not extend the exemption to other things (such as the semi-truck) not within the ambit of the definition. *See Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168 (2003). This doctrine has been applied repeatedly in construing Colorado statutes. *Henisse v. First Transit, Inc.*, 247 P.3d 577, 580 (Colo. 2011). In *Henisse*, the Colorado Supreme Court held: "When the legislature specifically includes one thing in a statute, it implies the exclusion of another . . . Because the General Assembly explicitly included some groups that would not normally be considered 'public employee[s]' under the CGIA, it necessarily excluded all other groups not fitting the definition." *Id.*

[14]    The structure of the Colorado Revised Statutes also supports the Court's ordinary meaning conclusion. The Homestead Statute is located in Title 38 of the Colorado Revised Statutes under the heading: "REAL PROPERTY Interests in Land." All, or the majority, of the other exemptions are

has no regular site.  It is not located in a residential area or mobile home park.  Instead, it was designed to be self-propelled and move.  That is the purpose of the Peterbilt Truck: to haul goods.  And the Debtor's Peterbilt Truck does move.  The Debtor and the Peterbilt Truck are on the road in long-distance hauling operations throughout the country 20 to 25 days per month.  Since most of the Debtor's business is outside of Colorado, the Debtor and the Peterbilt Truck typically are in Colorado only four or five days each month.  Thus, the Debtor cannot claim the Peterbilt Truck as a "homestead" "in Colorado."[15]  The Peterbilt Truck is only a truck.

C.    Colorado Case Law Requires an Association with Realty to Support a Claim
       under the Homestead Exemption.

No Colorado case law has expanded the Homestead Exemption to cover the cab of a semi-truck like the Peterbilt Truck (or anything remotely similar).  Instead, the focus always has been on real property.  Historically, the connection to land was patent.  In *Barnett v. Knight*, 3 P. 747, 748-49 (Colo. 1884), the Colorado Supreme Court determined:  "Homestead exemption is entirely the creature of statute, but the statute is not in derogation of the common law, for at common law the creditor had *no right to sell the debtor's land*."  (emphasis added.)  A decade later, the Colorado Supreme Court noted that the homestead exemption "does not fix the quantity of land which may be held as a homestead.  It is the value, not the amount, which is limited." *Dallemand v. Mannon*, 35 P. 679, 267-68 (Colo. 1894).

The required association of a homestead with real property has been reaffirmed, repeatedly, over the years.  For example, in *Robinson v. de Pinto (In re Robinson)*, 44 B.R. 292, 293-94 (D. Colo. 1984), Judge John P. Moore held:

> [L]ooking to the Colorado law to find a definition of the
> homestead exemption, we can determine *the homestead has always
> been regarded as an exemption which attached to realty and not to
> a debtor personally.*  (emphasis added).

The verbatim holding was approved by the Tenth Circuit Court of Appeals.  *Pruitt v. Wilson (In re Pruitt)*, 829 F.2d 1002 (10th Cir. 1987) (affirming decision of Judge John P. Moore and attaching a copy of his opinion (containing the quoted language) as an appendix).  Colorado courts are similar.  *Univ. Nat'l Bank v. Harsh*, 833 P.2d 846, 847 (Colo. App. 1992) ("the homestead exemption attaches automatically upon occupancy of real property as a home").

---

located in Title 13 "JUDGMENTS AND EXECUTIONS."  The structural location of the Homestead Statute reinforces the association with real property.

[15]      The Court determines that some association with land is required to claim an exemption under the Homestead Exemption.  For example, to properly claim the Homestead Exemption, even a mobile home or a manufacturer home should be sited on land permanently or semipermanently.  However, the Court does not determine that the debtor claiming the exemption must own the land.  That question is not presented in this case.  Instead, in this case, the Peterbilt Truck is not associated with any particular real property at all.  It is designed to move and is on the road outside of Colorado most of the time.

The Debtor cites only one decision to support his creative position: *In re Lepka*, 105 B.R. 638 (Bankr. D. Colo. 1989). In *Lepka*, the debtors had removed a camper from a pickup truck, placed it on the ground, lived in it, and intended it to be their home, at least until they constructed a more traditional home. *Id*. at 638. The camper in *Lepka* was "not, and never was, self-propelled, nor did it have wheels." *Id*. And the camper was not a "motor vehicle." *Id*. The debtors in *Lepka* put the camper on the ground —"on real property which they owned and which real property had no other improvements." *Id*. The Debtors had started work "on the foundation for a house." *Id*. And, the *Lepka* debtors "claimed as exempt the value of the real property"; not the camper.

The Court finds that *Lepka* does not support the Debtor. Unlike the *Lepka* camper, the Peterbilt Truck is a motor vehicle. It was not placed on ground that the Debtor owns. And the Debtor does not claim as exempt the value of any real property. So *Lepka* does not suggest that a homestead exemption is warranted for the Peterbilt Truck. Instead, *Lepka* supports the Court's determination that some association with realty is necessary to invoke the Homestead Statute.

V.    Conclusion and Order.

For the reasons set forth above, the Court

ORDERS that the Trustee's Objection is SUSTAINED; and

ORDERS that the Debtor's claim of a homestead exemption in the Peterbilt Truck, as listed on the Debtor's Schedule C, is DENIED. The Peterbilt Truck is not exempt under either C.R.S. §§ 38-41-201 or 201.5.

JUDGMENT shall enter DENYING the Debtor's claim of a homestead exemption in the Peterbilt Truck.

DATED this 23rd day of June, 2015.

BY THE COURT:

*Thomas B. McNamara*

Thomas B. McNamara, Bankruptcy Judge

11